UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Cory A. Trboyevich,

               Plaintiff,

    vs.                         REPORT AND RECOMMENDATION

Michael J. Astrue,[1]
Commissioner of Social
Security,

                Defendant.        Civ. No. 07-152 (ADM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's final decision which denied his application for Disability Insurance Benefits ("DIB"). The matter is now before the Court upon the parties' cross-Motions for Summary Judgment. The Plaintiff has appeared by Sean M. Quinn, Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney. For reasons which

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, we have substituted him as the named Defendant.

follow, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

## II. Procedural History

The Plaintiff first applied for DIB on April 5, 2004, at which time, he alleged that he had become disabled on June 20, 2002.[2]  [T. 61-64].  The Plaintiff met the insured status requirements at the alleged onset date of disability, and he remains insured for DIB through June 30, 2008.  [T. 18, 29].

On May 12, 2004, the State Agency denied the claim upon initial review, and upon reconsideration.  [T. 34-41].  The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on February 13, 2006, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by an attorney.  [T. 27-28].   Thereafter, on July 24, 2006, the ALJ issued a decision denying the Plaintiff's claim for benefits.  [T. 14-26].  On September 12, 2006, the Plaintiff requested an Administrative Review before the Appeals Council, [T. 12-13], and

---

[2]Some parts of the Record suggest that the Plaintiff alleges total disability beginning on June 26, 2002, [T. 66], while other parts of the Record identify June 20, 2002, [T. 16], as the date of his alleged disability.  We find that this is a minor clerical error, and does not materially affect our analysis of the ALJ's decision.  For ease of reference, we refer only to June 20, 2002, the date that the Plaintiff identified in his initial application for DIB, as the date of alleged disability.

submitted additional documents for the Appeals Council's consideration. However, on December 21, 2006, the Appeals Council denied the request for further review. [T.8-10]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §§404.981, and 416.1472.

## III. Administrative Record

A.   Factual Background. The Plaintiff was forty-one (41) years old at the time of the Hearing. [T. 24]. He has a high school education, and has taken some general college coursework. [T. 608-610]. He also served in the military. [T. 66]. The Plaintiff has worked as a certified nursing assistant, [T. 611], and as a laborer and a firefighter, with the Minnesota Department of Natural Resources, and the United States Forest Service. [T. 611]. The Plaintiff last worked full-time in 2002, for Potlatch Corporation, as a forklift operator. [T. 84]. On May 25, 2002, the Plaintiff was injured at work, when he walked into a low-lying steel beam. [T. 66]. As a result of his injury, the Plaintiff experienced pain in his head and neck, and tenderness into his shoulders. [T. 89]. His treating physician concluded that his injury was akin to

whiplash, and initially recommended ice and Motrin, but later prescribed Flexeril[3] and Percocet.[4] Id. The Plaintiff was restricted to light-duty work, and he began physical therapy. [T. 90]. The Plaintiff was subsequently terminated from his employment, on June 26, 2002. Id.

The Plaintiff alleges that he has been unable to work full-time since June 20, 2002, due to pain in his neck and upper back, and a loss of strength in his arms, stemming from his work injury. [T. 611].

1.    Medical Records Before Alleged Onset Date of June 20, 2002. On July 4, 1989, the Plaintiff flipped a four-wheeler, and injured his back. [T. 193]. He visited the emergency room, and an x-ray revealed a minimal compression fracture at his L2-L3 vertebrae. [T. 193-94]. A physician recommended bed rest, and heat, to ease his pain. [T. 193].

On August 30, 1996, the Plaintiff was seen by a chiropractor, and complained of pain in his neck and upper back. [T. 269]. The Plaintiff reported that, in the

---

[3]Flexeril is "indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Physician's Desk Reference, pp. 1833 (60th ed. 2006).

[4]Percocet is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, pp. 1114 (60th ed. 2006).

summer of 1996, he was hit in the jaw by a large chunk of wood, and experienced neck pain.  Id.  The Plaintiff underwent an x-ray, which revealed mild scoliosis.  [T. 270].

On February 27, 1997, the Plaintiff was again seen by a chiropractor, and complained of neck and shoulder pain.  [T. 269].  The Plaintiff reported that he believed his pain stemmed from his bed.  Id.  In 1998, the Plaintiff underwent an MRI scan, which revealed no abnormalities.  [T. 195].  The Plaintiff continued to visit the chiropractor, every few months, until September of 2001, complaining of soreness and pain in his neck, shoulders, upper back, and arms.  [T. 249-66].

On March 1, 2000, the Plaintiff was seen by a neurologist at the Duluth Clinic, and complained of intermittent dizziness.  Id.  The neurologist noted that the Plaintiff had a Type I Arnold-Chiari malformation,[5] though it was mostly asymptomatic.  [T. 195-96].  The Plaintiff reported blurred vision, and headaches, as well as fatigue, low energy, and anxiety.  [T. 195].  The Plaintiff also reported some back pain, and

---

[5]Chiari's malformation is a "congenital anomaly in which the cerebellum and medulla oblongata, which is elongated and flattened, protrude into the spinal canal through the foramen magnum[.]"  Dorland's Illustrated Medical Dictionary, at 1050 (29th Ed. 2000).  It is classified into three (3) types, according to severity.  Id.

swollen joints.   [T. 196].   The neurologist concluded that another MRI was unnecessary, and prescribed Celexa,[6] to ease the Plaintiff's symptoms.  [T. 197].

On July 8, 2000, the Plaintiff was seen in the emergency room for pain in his right shoulder.  [T. 198].  He injured it on June 20, 2000, while disciplining his dog, though the Plaintiff later reported that he may have initially injured his shoulder on June 18, 2000, while at work.  [T. 205].  The Plaintiff was originally seen at a clinic by Dr. Rutherford, who diagnosed shoulder strain, and prescribed Ultram.[7]  [T. 198].  When the pain persisted, after the Plaintiff re-injured his shoulder at work, the Plaintiff returned to the clinic, and was prescribed Vioxx.[8]   [T. 198, 205].  After again re-injuring his shoulder, the Plaintiff visited the emergency room because of increased pain.  [T. 198, 205].  An x-ray revealed no new injury.  [T. 199].  The Plaintiff was

---

[6]Celexa is "indicated for the treatment of depression."   Physician's Desk Reference, pp. 1178 (60th ed. 2006).

[7]Ultram is a trademarked preparation of tramadol hydrochloride.  See, Dorland's Illustrated Medical Dictionary, at 1909 (29th Ed. 2000).  Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain[.]"  Id., at 1862.

[8]Vioxx is indicated for the relief of the signs and symptoms of osteoarthritis, and rheumatoid arthritis in adults.  See, Physicians' Desk Reference, at 2122 (57th Ed. 2003).

prescribed Toradol,[9] and Clinoril,[10] and was ordered to remain off work until July 11, 2000.  [T. 198].

The Plaintiff's shoulder pain persisted, and he eventually began a physical therapy program on July 12, 2000.  [T. 202].  He attended physical therapy six (6) times, between July 12 and July 27, 2000, and he was then discharged when he failed to make any further appointments.  [T. 202-03, 207-08].  His pain had improved, even though he had not regained his full range of motion.  [T. 202].  On August 16, 2000, the Plaintiff had a followup MRI scan of his right shoulder, which revealed no abnormalities.  [T. 209].

On October 11, 2001, the Plaintiff was seen in the emergency room, after a motor vehicle accident.  [T. 210].  The Plaintiff complained of neck and back pain, stiffness, and pain in his left hand.  Id.  An x-ray revealed no new fractures or swelling.  [T. 214].  He was diagnosed with a whiplash injury and back strain, was prescribed

---

[9]Toradol is a trademarked preparation of ketorolac tromethamine.  See, Dorland's Illustrated Medical Dictionary, at 1853 (29th Ed. 2000).  Ketorolac tromethamine is "a nonsteroidal anti-inflammatory agent used for short-term management of pain[.]" Id. at 942.

[10]Clinoril is "a  non-steroidal anti-inflammatory drug, also possessing analgesic and antipyretic activities." Physician's Desk Reference, pp. 1900 (60th ed. 2006).

Vicodin,[11] and was discharged.   [T. 210].   The Plaintiff continued to have pain in his left hand and back, and subsequently, he began occupational therapy on October 17, 2001.  [T. 231-35].   The therapist observed that the Plaintiff had a full range of motion, but the Plaintiff reported that driving, bending, and lifting, bothered him.  [T. 226].   On December 17, 2001, the Plaintiff reported that he was pain-free, and that he would continue his therapy on his own.  [T. 230].

On May 26, 2002, the Plaintiff injured himself at work, when he walked into a low-lying steel beam, while wearing a hard hat.  [T. 244].   The Plaintiff heard a crunch, id., and immediately experienced pain in the front of his head, and in his neck.  [T. 236].   On May 29, 2002, the Plaintiff presented in the emergency room, complaining of neck pain, which stemmed from his work injury.  Id.   However, the Plaintiff did not have any acute pain, and he reported no back pain, or blurry vision.  Id.   An x-ray revealed no bone or joint abnormalities, nor any improper alignment.  [T. 242].   The emergency room physician recommended Motrin and ice.  [T. 236].   He did not recommend that the Plaintiff stay home from work, although he did recommend avoiding any sudden movements of his head.  Id.

---

[11]Vicodin is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, pp. 530 (60th ed. 2006).

On June 4, 2002, the Plaintiff was seen by Dr. John Fedje-Johnston, his family physician.  [T. 370].  The Plaintiff complained that his pain had increased since his accident, and that he was having difficulty performing his usual job.  Id.  Dr. Fedje-Johnston restricted the Plaintiff to light-duty work, and prescribed Flexeril and Percocet, as well as physical therapy.  [T. 370-71].

On June 10, 2002, the Plaintiff was seen by a physical therapist.  [T. 272].  The Plaintiff reported pain in his neck and upper back, with intermittent headaches.  Id.  He was then taking Flexeril, Percocet, and ibuprofen.  Id.  The physical therapist noted that the Plaintiff's range of motion in his neck was limited, which prevented him from performing his usual occupation, as a forklift driver.  Id.  The physical therapist recommended sessions three (3) times per week, for two (2) weeks.  [T. 273].  The Plaintiff attended a total of eight (8) sessions, until June 20, 2002, when he was terminated from his employment at Potlatch.  [T. 274, 280].

2.    Medical Records After The Alleged Onset Date of June 20, 2002.

On June 24, 2002, the Plaintiff was seen by a chiropractor, for continued pain in his neck and back.  [T. 243].  The Plaintiff reported that, by the end of his workday, his neck was very stiff.  Id.  On June 24, 2002, the Plaintiff also completed a workers' compensation questionnaire, based upon his injury.  [T. 244].  He reported that he was

currently taking Percocet, Flexeril, and ibuprofen, and that his condition was unchanged since the injury.  Id.    He reported constant pain in his mid- and upper-back.  [T. 245].  He also reported stiffness in his neck, and headaches.  [T. 246].  The Plaintiff stated that his job did not require pushing, pulling, climbing or crawling, and that he only occasionally lifted up to ten (10) pounds.  [T. 246-47].

On June 27, 2002, the Plaintiff was seen by Dr. Fedje-Johnston, and complained of persistent pain.  [T. 366].  Dr. Fedje-Johnston recommended an MRI scan, id., and restricted the Plaintiff to light-duty work.  [T. 365].  On July 11, 2002, the Plaintiff underwent an MRI scan, which revealed posterior changes in the ligaments, associated with neck strain, and a minor bulge at his C5-C6 vertebrae.  [T. 283, 362, 378].  On July 15, 2002, Dr. Fedje-Johnston released him back to work.  [T. 363].

On July 29, 2002, the Plaintiff was seen by Dr. Peter Friedlieb, and reported that his neck pain had increased after he performed several chores, including mowing the lawn and heavy lifting.  [T. 360].  The Plaintiff denied any pain in his arms or weakness, though he reported pain in his shoulder.  Id.  Dr. Friedlieb recommended that the Plaintiff avoid frequently turning his head at work, and work only eight (8)

hours per day.  [T. 360-61].  He also prescribed Skelaxa,[12] and physical therapy.  [T. 360].

Beginning on August 1, 2002, the Plaintiff renewed his physical therapy sessions.  [T. 283].  The Plaintiff reported neck and head pain, daily headaches, and restricted mobility in his neck and upper back.  [T. 283-84].  He also reported that mowing the lawn, moving boxes, and driving, exacerbated his pain.  Id.  On August 21, 2002, Dr. Fedje-Johnston recommended that the Plaintiff restrict his work to occasionally lifting ten (10) pounds, but he concluded that the Plaintiff could work up to a twelve (12) hour shift.  [T. 359].

On October 10, 2002, the Plaintiff was seen by Dr. Matthew Eckman, a practitioner of physical medicine and rehabilitation, upon a referral by Dr. Fedje-Johnston.  [T. 415].  Dr. Eckman thoroughly reviewed the Plaintiff's self-reported medical and employment history, and his then-current symptoms.  [T. 415-17].  The Plaintiff reported daily headaches, and pain from his neck through his shoulders, but he had good hand function.  Id.  The Plaintiff reported difficulty with driving, mowing

---

[12]Skelaxin is "indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions."  Physician's Desk Reference, pp. 1685 (60th ed. 2006).

the lawn, riding a four-wheeler, and carrying his school bag.  [T. 418].  He was able to cook and fish, although his mother did most of the housework.  Id.  The Plaintiff was taking ibuprofen, Percocet, Zanaflex, and Prevacid.[13]  Id.  The Plaintiff denied any anxiety or depression.  [T. 419].  Dr. Eckman observed that the Plaintiff had good range of motion throughout his shoulders, but tenderness along his cervical spine.  [T. 419-20].

Dr. Eckman concluded that the Plaintiff suffered from a cervical strain, with underlying degenerative disc disease, and ligamentous strain.  [T. 420].  Dr. Eckman opined that the Plaintiff's condition stemmed from his 2002 work injury, rather than from his 2001 motor vehicle accident.  Id.  Dr. Eckman also opined that the Plaintiff's nicotine addiction had aged his cervical spine, and slowed his healing.  Id.  Ultimately, Dr. Eckman concluded that the Plaintiff was unable to perform his former job, or to seek competitive employment, though he believed that the Plaintiff would recover enough to pursue a position as a licensed practical nurse ("LPN") -- the Plaintiff's preferred profession.  [T. 420-21].  Dr. Eckman recommended physical therapy, before considering more intense intervention.  [T. 421].  Dr. Eckman further

---

[13]Prevacid is "indicated for short-term treatment * * * for healing and symptom relief of active duodenal ulcer."  Physician's Desk Reference, pp. 3271 (60th ed. 2006).

recommended that the Plaintiff remain off work, in order to pursue his LPN coursework.  [T. 426].

In a physical therapy session on October 22, 2002, the Plaintiff reported that his pain increased when he sat at a desk for longer than three (3) hours, read for longer than two (2) hours, or rode in a car for more than thirty (30) minutes.  [T. 304]. Progress reports from the Plaintiff's physical therapy recorded improvement in his condition.   [T. 300-02].   The Plaintiff did, however, continue to report daily headaches.  Id.

On November 15, 2002, the Plaintiff was examined by an independent medical evaluator ("IME"), who had been hired by his former employer with respect to the Plaintiff's workers' compensation claim.  [T. 543].  The Plaintiff reported frequent neck pain and headaches, and stated that increased activity, such as the long drive from his home to the IME, made his symptoms worse.  [T. 544].  The Plaintiff also reported, however, that his pain had greatly improved in the several months since his injury.  Id.  The Plaintiff told the IME that he had a prescription for Percocet, but that he was not making use of it.  Id.  The IME observed that the Plaintiff had a full cervical range of motion, although hyperextension caused him some pain.  Id.  The Plaintiff had some pain on the right side of his neck, upon palpation.  Id.

- 13 -

The IME reviewed the Plaintiff's medical records and history, although he was unable to review Dr. Eckman's evaluations.  Id.  The IME observed that the Plaintiff had recovered from his cervical strain, to a maximum medical improvement.  [T. 546].  He concluded that the Plaintiff was capable of returning to work, without restrictions.  Id.

Following his examination by the IME, the Plaintiff reported a deterioration of his condition.  [T. 299, 303, 354].  The Plaintiff told his health care providers that the IME had required him to maintain a fixed head position, which exacerbated his pain.  [T. 299, 303, 411].  In a follow-up visit with Dr. Eckman, on November 27, 2002, the Plaintiff reported that his headaches had increased in intensity since his visit with the IME, and that his other symptoms had been aggravated.  [T. 411].  Dr. Eckman recommended that the Plaintiff remain off work.  [T. 414].

On February 11, 2003, the Plaintiff was seen by Dr. Eckman, for a follow-up visit.  [T. 404].  The Plaintiff reported headaches, five (5) to six (6) times per week, which lasted one (1) hour, or sometimes longer.  Id.  The Plaintiff reported that he avoided snowmobiling, and riding a four-wheeler, and that a recent ice fishing trip had bothered him.  Id.  Dr. Eckman observed that the Plaintiff had a good range of motion

in his upper extremities, though he was sensitive upon palpation.  [T. 405].  He recommended that the Plaintiff remain off work.  [T. 407].

On March 11, 2003, the Plaintiff ended his physical therapy, and informed his therapist that he planned to seek treatment from a chiropractor.  [T. 299].  On April 8 and 23, 2003, the Plaintiff underwent facet injections, as well as spinous injections.  [T. 343, 376-77].  His chiropractor noted that the Plaintiff had not experienced much pain relief, following the injections.  [T. 343].  The chiropractor observed that the Plaintiff's Type I Arnold-Chiari malformation might have resulted in an abnormal injury, beyond what would be expected in a patient without the malformation.  Id.  The chiropractor also noted that a Type I Arnold-Chiari malformation can itself cause headaches and neck pain.  Id.  On May 2, 2003, the Plaintiff reported that his headaches had become more intense, following the facet injections.  [T. 347].

On May 15, 2003, the Plaintiff was seen by Dr. Eckman, for a follow-up visit.  [T. 399].  The Plaintiff's neck and shoulders were sore, and he described difficulty

with long drives and prolonged yard work.  [T. 400].  Dr. Eckman recommended light-duty work, and prescribed Ambien,[14] and Lortab.[15]  [T. 401].

On July 28, 2003, the Plaintiff was seen by a physical therapist, upon the referral of Dr. Eckman, in order to learn how to use a machine, which would provide transcutaneous electrical nerve stimulation (a "TENS unit").  [T. 307].  The Plaintiff and Dr. Eckman hoped that use of the TENS unit would decrease the Plaintiff's reliance on pain medication.  Id.  On August 18, 2003, in a follow-up visit with Dr. Eckman, the Plaintiff reported that the TENS unit had been more painful than helpful. [T. 395].  The Plaintiff was then working, performing medical transport to the Twin Cities, and providing part-time child-care for his ex-wife's seven-month-old son.  Id. The Plaintiff reported daily headaches, though minor, and continued tenderness in his neck.  [T. 396-97].  Dr. Eckman recommended light-duty work, or less, with frequent changes of positions.  [T. 397-98].

---

[14]Ambien is "indicated for the short-term treatment of insomnia."  Physician's Desk Reference, pp. 2868 (60th ed. 2006).

[15]Lortab is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, pp. 3315 (60th ed. 2006).

On September 12 and 26, 2003, the Plaintiff underwent diagnostic nerve blocks at the Pain Center Clinic.  [T. 312, 317].  The Plaintiff's pain decreased in intensity following those procedures.  [T. 312].

On October 10, 2003, the Plaintiff was again evaluated by an IME, for his workers' compensation claim.  [T. 538].  The Plaintiff reported that he had received cervical injections, six (6) weeks earlier, with no appreciable improvement.  Id.  The Plaintiff complained of constant pain in his neck, upper back, and right shoulder, as well as headaches three (3) times weekly.  [T. 538-39].  The Plaintiff reported that Dr. Eckman had ordered a number of work restrictions, and that he had been unable to find any employment which could accommodate those restrictions.  [T. 539].  The Plaintiff was then taking Lorcet,[16] and Percocet, for his symptoms.  Id.  The IME observed that the Plaintiff had a full cervical range of motion, though he complained of pain in all directions, except flexion, and that he had full range of motion in his shoulders.  [T. 540].

---

[16]Lorcet contains hydrocodone bitartrate.  See, Physician's Desk Reference, pp. 1198 (60th ed. 2006).  Hydrocodone bitartrate is "a semisynthetic derivative of codeine used as an antitussive[.]"  Dorland's Illustrated Medical Dictionary, at 840 (29th Ed. 2000).

The IME concluded that the Plaintiff suffered from chronic cervical strain, given his continued subjective complaints of pain in his neck and back.  [T. 541].  The IME opined that the Plaintiff's "subjective complaints continue to be out of proportion to any objective abnormalities."  Id.  The IME reiterated his opinion that the Plaintiff had reached maximum medical improvement from his work injury, although he recommended a discogram,[17] and a consultation with a spine specialist, to rule out objective abnormalities, which would not appear on an MRI scan.  Id.

On November 19, 2003, the Plaintiff attended a follow-up visit with Dr. Eckman.  [T. 387].  The Plaintiff reported continued neck pain, and a couple of headaches each week.  Id.  At that time, the Plaintiff was caring for his ex-wife's ten-month-old son, and he reported that he had gone hunting that fall.  Id.  The Plaintiff reported difficulty riding in a car, and performing household chores.  [T. 387-88].  Dr. Eckman observed that the Plaintiff might be able to return to sedentary or light-duty work, after undergoing a radiofrequency procedure.  [T. 389].  In a letter to the Plaintiff's counsel, also dated November 19, 2003, Dr. Eckman opined that the Plaintiff's work injury, and resultant symptoms, had prevented him from pursuing regular employment.  [T. 391].

---

[17]A discogram, or diskogram, is "a radiograph of an intervertebral disk." Dorland's Illustrated Medical Dictionary, at 526 (29th Ed. 2000).

- 18 -

On February 27, 2004, the Plaintiff attended a follow-up visit with Dr. Eckman. [T. 383]. The Plaintiff reported that he was in school, and was no longer providing child care for his ex-wife's son. Id. Based on the Plaintiff's continued symptoms, Dr. Eckman concluded that the Plaintiff would be unable to gain competitive employment "until he completes his schooling and vocational rehab[ilitation]." [T. 384]. Dr. Eckman recommended radiofrequency facet rhizotomy,[18] or neurotomy.[19] Id. He also recommended that the Plaintiff remain off of work. [T. 386].

On April 2, 2004, the Plaintiff underwent radiofrequency neurolysis[20] at the Pain Center Clinic. [T. 310]. On May 17, 2004, the Plaintiff underwent another MRI scan of his cervical spine, which revealed normal alignment, and a mild degenerative change of the C5-C6 vertebrae. [T. 379, 427].

In a follow-up visit with Dr. Eckman on June 8, 2004, the Plaintiff reported that his symptoms had not improved since the neurolysis. [T. 379]. Although the IME

------

[18]Rhizotomy is the "interruption of a cranial or spinal nerve root." Dorland's Illustrated Medical Dictionary, at 1574 (29th Ed. 2000).

[19]Neurotomy is the "interruption of a nerve through surgical cutting or production of artificial lesions." Dorland's Illustrated Medical Dictionary, at 1215 (29th Ed. 2000).

[20]Neurolysis is also known as a "nerve block." Dorland's Illustrated Medical Dictionary, at 1210 (29th Ed. 2000).

had recommended a discogram, Dr. Eckman observed that the procedure involved some risk.  Id.  Dr. Eckman also observed that the Plaintiff had good hand function, but experienced difficulty standing, performing chores, and riding in cars.  [T. 380].  The Plaintiff also reported muscle tension headaches, and underlying depression.  [T. 381].  After consulting with the Plaintiff, Dr. Eckman recommended a return to sedentary work, for up to four (4) hours per day, with limited driving, and frequent changing of position.  Id.

On August 11, 2004, the Plaintiff underwent a mental health assessment.  [T. 428].  The Plaintiff was then using Duragesic patches,[21] and taking Percocet, Ambien, and Effexor.[22]  Id.  The Plaintiff stated that he had been experiencing passive suicidal ideation for one (1) to two (2) years.  Id.  He also reported anxiety, restlessness, loss of appetite, sexual dysfunction, and irritability.  Id.  The Plaintiff stated that his depression symptoms began with his work injury, and had gradually worsened.  Id.  The Plaintiff reported that he enjoyed watching his son play T-ball, walking, boating,

---

[21]Duragesic is a "transdermal system," which is "indicated for management of persistent, moderate to severe chronic pain[.]"  Physician's Desk Reference, pp. 2448-49 (60th ed. 2006).

[22]Effexor is "indicated for the treatment of major depressive disorder."  Physician's Desk Reference, pp. 3406 (60th ed. 2006).

spending time at his girlfriend's hobby farm, and gardening. [T. 429]. The Plaintiff advised that he was unable to garden for prolonged periods, due to his pain. Id. The Plaintiff was able to cook, but found both mowing the lawn and cleaning the house difficult. Id. He was also able to drive, play cards, watch television, and play catch with his son, for brief periods of time. Id. The Plaintiff had some difficulty with concentration, but his long-term memory was intact. [T. 430]. The Plaintiff was diagnosed with Adjustment Disorder, with depressed mood, primarily based on the stress related to his physical health, the financial consequences of his unemployment, and his pain management issues. Id.

In a subsequent assessment, based on his mental health evaluation, the Plaintiff was identified as having moderate limitations on his ability to understand, remember, and carry out detailed instructions, and on his ability to concentrate. [T. 446]. The Plaintiff was assessed as capable of performing routine, repetitive tasks. [T. 448].

On May 4, 2004, Dr. Thomas Chisholm, who is a State Agency physician, and an orthopedic specialist, conducted a vocational capacity assessment, based on the Plaintiff's medical records. [T. 452, 460]. Dr. Chisholm concluded that the Plaintiff was capable of occasionally lifting twenty (20) pounds, and frequently lifting ten (10) pounds; that he was capable of standing or sitting for a total of six (6) hours in an eight

(8) hour workday; and that his ability to push and pull was unlimited.  [T. 453].  He recommended restricting the Plaintiff from overhead work, and avoiding exposure to hazardous machinery or unprotected heights.  [T. 455-56].  Dr. Chisholm concluded that the Plaintiff's symptoms were out of proportion with the clinical findings in his medical records.  [T. 457].

On January 6, 2005, the Plaintiff underwent a four (4) level cervical discography, which revealed degeneration of three (3) discs.  [T. 473-74, 491-92].  The results of the discogram were reviewed by Dr. Scott Dulebohn, a neurosurgeon, who concluded that surgery would be unlikely to improve the Plaintiff's condition.  [T. 493].  Dr. Dulebohn also concluded that the Plaintiff had reached maximum medical improvement, though he believed his pain management might improve.  Id.  Dr. Dulebohn opined that the Plaintiff had permanent partial disability of twenty-one (21) percent.  Id.  Dr. Dulebohn deferred to Dr. Eckman, with respect to the Plaintiff's ability to perform sedentary work, either on a full- or part-time basis.  Id.

On March 2, 2005, the Plaintiff was seen by Dr. Fedje-Johnston, and reported that his depression had recently worsened, corresponding to some personal difficulties with his family.  [T. 472].  Dr. Fedje-Johnston also noted that the Plaintiff was frustrated by his inability to perform a number of physical activities.  Id.  Dr. Fedje-

- 22 -

Johnston did not recommend any change in the Plaintiff's medication.   Id.   In a letter

to the Plaintiff's counsel, dated March 4, 2005, the Plaintiff's psychotherapist reported

a diagnosis of Adjustment Disorder with depressed mood.   [T. 498].   The

psychotherapist felt that the Plaintiff's psychological distress stemmed from his work

injury, and subsequent unemployment.   [T. 499].   She stated that she had encouraged

the Plaintiff to continue his college coursework.   Id.

On March 10, 2005, the Plaintiff was seen by Dr. Timothy Pehl, and complained

of a four (4) day headache, extending from his right shoulder up to his right eye.   [T.

471].   Dr. Pehl concluded that the Plaintiff's neck pain might be triggering his

headache, and prescribed Naprosyn.[23]   Id.

On April 2, 2004, Dr. David Nelson, a practitioner of pain management,

performed a rhizotomy on the Plaintiff, which did not significantly improve his pain,

nor his range of motion in his neck.   [T. 530].   On April 7, 2005, Dr. Eckman

administered Botox injections[24] to the Plaintiff's upper back, again with no significant

---

[23]Naprosyn is indicated for the treatment of arthritis, tendonitis, bursitis, acute gout, and pain management.  See, Physician's Desk Reference, pp. 2770 (60th ed. 2006).

[24]Botox is "indicated for the treatment of cervical dystonia in adults to decrease the severity of abnormal head position and neck pain[.]"  Physician's Desk Reference, pp. 567 (60th ed. 2006).

- 23 -

improvement in the Plaintiff's pain.  [T. 465-66, 468, 503].  On April 27, 2004, the Plaintiff was seen by Dr. Fedje-Johnston for a follow-up visit.  [T. 530].  At that time, the Plaintiff was taking up to six (6) tabs of Percocet daily, but that medication was not successful in managing his pain.  Id.

On May 13, 2004, the Plaintiff was seen by Dr. Nelson for a follow-up visit.  [T. 504].  The Plaintiff reported that he had received nerve blocks and radiofrequency neurotomy, approximately six (6) weeks earlier, with a thirty (30) percent improvement in his symptoms.  Id.  Dr. Nelson recommended a new MRI scan, a neurosurgery consultation, and a psychological consultation.  Id.  Dr. Nelson observed that Dr. Eckman had recommended that the Plaintiff pursue a new line of employment with fewer physical demands, and Dr. Nelson agreed with that suggestion.  Id.  On June 8, 2004, the Plaintiff was seen by Dr. Eckman, who concluded that the Plaintiff could return to part-time work, with limited driving, and the ability to change positions frequently.  [T. 567].

From June through December of 2004, the Plaintiff attended regular follow-up visits, for pain management issues.  [T. 518-529].  In a note dated June 11, 2004, Dr. Fedje-Johnston observed that Dr. Eckman had advised the Plaintiff that he would be dealing with chronic pain, and that a "cure" of his symptoms was unlikely.  [T. 529].

Beginning in June, the Plaintiff was initially taking Neurontin[25] and Effexor, and using Duragesic patches.   [T. 529].   However, when Neurontin caused severe headaches, he discontinued its use.  [T. 528].  On June 25, 2004, the Plaintiff reported that Effexor helped his moods considerably, and that his pain was significantly reduced by the Duragesic patches.  [T. 528].  The Plaintiff was even able to engage in some regular activities without difficulty.  Id.

By July 21, 2004, however, the Plaintiff's pain had again increased, and he was suffering some side-effects from the Duragesic patches.  [T. 527].  In addition, his depression had worsened, despite his Effexor regimen.  Id.  Dr. Fedje-Johnston recommended an increased dosage of Effexor.  Id.  By August 25, 2004, the Plaintiff's prescription for Duragesic patches had been discontinued, and he was prescribed OxyContin[26] and Percocet, as well as a higher dose of Effexor.  [T. 525].  On September 17, 2004, the Plaintiff reported that his pain had improved with the new pain medications, and he requested an increased dosage.  [T. 524].  Dr. Fedje-

---

[25]Neurontin is "indicated for the management of postherpetic neuralgia in adults."  Physician's Desk Reference, pp. 2500 (60th ed. 2006).

[26]Oxycontin is "indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time."  Physician's Desk Reference, pp. 2699 (60th ed. 2006).

Johnston prescribed an increase in OxyContin.  Id.  On October 26, 2004, the Plaintiff

reported that the OxyContin had decreased his pain.  [T. 520].  However, on

November 24, 2004, the Plaintiff requested additional Percocet, in order to manage his

breakthrough pain.  [T. 519].  Dr. Fedje-Johnston prescribed the increase, and stated

that if the Plaintiff was controlling his dosage after one (1) month, he could sign a

contract for this level of narcotics use.  [T. 518-19].

On October 21, 2004, the Plaintiff was seen by Dr. Dulebohn, upon Dr.

Nelson's referral.  [T. 559].  Dr. Dulebohn noted that the Plaintiff's treatment with Dr.

Eckman had not resulted in any improvement, and that his MRI scan was

unremarkable.  Id.  Dr. Dulebohn recommended a discography, in order to determine

if the Plaintiff was a surgical candidate.  Id.

On November 17, 2004, the Plaintiff was seen by Dr. Eckman for a follow-up

visit.  [T. 556].  The Plaintiff reported that car rides, and housework, made his

symptoms worse.  [T. 557].  Dr. Eckman recommended that the Plaintiff pursue

sedentary work, with limited driving, and the ability to change positions frequently.

[T. 557-58, 565].

On March 22, 2005, the Plaintiff was seen by Dr. Eckman for a follow-up visit.

 [T. 553].  The Plaintiff reported that he had recently suffered from a six (6) day

headache, which was relieved by muscle relaxants, as prescribed by Dr. Fedje-Johnston.  Id.  The Plaintiff also reported that riding in vehicles, and performing housework, increased his pain.  Id.  Dr. Eckman observed that the Plaintiff had good neck muscle resistance, and a full range of motion in his shoulders.  [T. 554].  Dr. Eckman concluded that additional physical therapy was unlikely to improve the Plaintiff's condition, and recommended that the Plaintiff consider a chronic pain management program.  Id.  Dr. Eckman also concluded that the Plaintiff could potentially return to sedentary work, although he recommended that he remain off of work.  [T. 554, 563].

On May 18, 2005, the Plaintiff underwent a sleep study, which revealed obstructive sleep apnea.  [T. 506].  The Plaintiff reported that his neck pain and medication caused insomnia.  [T. 551].  The evaluating physician determined that the study's results were equivocal, due to the Plaintiff's pain during sleep.  [T. 506].  The physician recommended repeating the study.  Id.

On June 15, 2005, a psychotherapist completed a psychological assessment of the Plaintiff, based on several therapy sessions.  [T. 508].  The Plaintiff denied any present suicidal ideation, though he admitted having suicidal thoughts in the past.  [T.

509].  The Plaintiff was then taking OxyContin, Ambien, Effexor, and Naproxen.[27]  Id.

The Plaintiff reported mild difficulty with concentration, difficulty sleeping, loss of

energy, and feelings of hopelessness and depression.  Id.  The therapist administered

two (2) diagnostic tests:  the Minnesota Multiphasic Personality Inventory-2 ("MMPI-

2"), and the Millon Behavioral Medicine Diagnostic ("Millon").  [T. 510].  The

Plaintiff's Millon results were consistent with an individual who is "extremely sensitive

to physical changes which can result in many hypochondriacal complaints," and

"prone to us[ing] excessive amounts of pain medication[.]"  [T. 514].

On June 27, 2005, the Plaintiff was again evaluated by an IME, for his workers'

compensation claim.  [T. 532].  The Plaintiff reported periodic headaches, as well as

pain in his upper back, neck and shoulder.  [T. 533].  The Plaintiff also reported that

he underwent a radiofrequency rhizotomy, in April of 2004, which caused him great

pain for three (3) to four (4) weeks.  [T. 532].  The Plaintiff also reported that Botox

injections had provided him with some relief, for approximately three (3) weeks.  [T.

533].  In addition, the Plaintiff reported that his discogram revealed degeneration of

_____

[27]Naproxen is a "nonsteroidal anti-inflammatory drug * * * with analgesic and
antipyretic properties."  Physician's Desk Reference, pp. 2769 (60th ed. 2006).

- 28 -

three (3) discs.  Id.  The Plaintiff was then taking OxyContin and Percocet for pain. Id.

The IME observed that the Plaintiff had a "surprisingly good" range of motion in his neck, and a full range of motion in his shoulder.  [T. 534].  The IME acknowledged that the discogram revealed mild degenerative disc disease, which changed the IME's prior diagnosis of cervical strain.  [T. 536]. The IME opined that the Plaintiff's course of treatment had been both reasonable and necessary, but concluded that the Plaintiff's subjective complaints continued to outweigh his objective medical condition.  Id.  The IME concluded that the Plaintiff had a ten (10) percent permanent partial disability, and would be permanently restricted from activities which required repetitive neck motion.  Id.

On July 26, 2005, the Plaintiff was seen by Dr. Eckman for a follow-up visit. [T. 549].  The Plaintiff reported that he was able to walk up to one (1) mile, for exercise.  Id.  The Plaintiff complained of headaches and pain in his neck, back, and shoulders.  Id.  Dr. Eckman observed that the Botox injections had offered some relief, and the Plaintiff was then taking OxyContin, Percocet, Effexor, Ambien, and Prevacid.  Id.  The Plaintiff also took Naproxen, on occasion.  Id.  Dr. Eckman opined that the Plaintiff was unable to engage in competitive employment, and recommended

- 29 -

that the Plaintiff remain off work.  [T. 550, 562].  Dr. Eckman recommended a new

MRI scan, in order to check for changes in his condition.  [T. 550].

On August 2, 2005, the Plaintiff underwent an MRI scan, which revealed mild

disc degeneration at his C5-C6 vertebrae.  [T. 548, 568].  Dr. Eckman concluded that

the MRI scan revealed no significant change since the Plaintiff's MRI scan in May of

2004.  [T. 548].

On August 5, 2005, the Plaintiff was seen by Dr. Fedje-Johnston for a follow-up

visit.  [T. 464].  Dr. Fedje-Johnston noted that the Plaintiff suffered from a restricted

range of motion in his neck.  Id.  The Plaintiff also had persistent neck pain,

notwithstanding all of his prior interventions.  Id.  Dr. Fedje-Johnston recommended

a neurosurgery consultation.  Id.  On September 7, 2005, Dr. Fedje-Johnston noted

that the Plaintiff's surgery consultation was pending.  [T. 462, 585].

In a letter to the Plaintiff's counsel, dated September 10, 2005, Dr. Eckman

reported that the Plaintiff's symptoms were persistent, including neck and shoulder

tension, with muscle tension headaches, due to his cervical strain and multilevel

degenerative disc disease.  [T. 478].  Dr. Eckman also reported that the Plaintiff was

not a likely surgical candidate, but added that he hoped the Plaintiff's condition would

improve.  Id.  Dr. Eckman concluded that the Plaintiff would have difficulty sustaining

competitive employment, since his work abilities would be restricted by his physical limitations. Id. In part, Dr. Eckman stated that "rational employers would [not] be able to tolerate the degree of absenteeism likely to result from [the Plaintiff's] condition." Id. Dr. Eckman also observed that the Plaintiff's headaches impaired his concentration, and increased his irritability. [T. 479]. Dr. Eckman offered those conclusions, in response to a letter from the Plaintiff's counsel dated August 15, 2005, which had inquired about the Plaintiff's ability to work, either full- or part-time. [T. 480].

On October 7, 2005, the Plaintiff was seen by Dr. Fedje-Johnston for a follow-up visit. [T. 578]. The Plaintiff reported that his pain was reasonably controlled, though his activities were limited. Id.

On November 25, 2005, the Plaintiff was seen by Dr. Eckman for a follow-up visit. [T. 570]. The Plaintiff continued to report constant neck pain and severe headaches. Id. The Plaintiff was then taking OxyContin, Percocet, Naproxen, Ambien, and Effexor. [T. 570-71]. The Plaintiff reported that he walked one (1) mile, approximately two (2) times per week, and Dr. Eckman recommended that he try to walk on a daily basis. [T. 571]. Dr. Eckman observed that the Plaintiff's condition

remained unchanged.  Id.  He recommended that the Plaintiff remain off work.  [T. 572].

On December 8, 2005, the Plaintiff was seen for a follow-up visit, to refill his prescriptions.  [T. 576].  Dr. Pehl observed that the Plaintiff's pain was unchanged, and described it as "moderately bothersome but tolerable with the narcotics."  Id.  The Plaintiff was then taking OxyContin, Percocet, Ambien, and Effexor.  Id.

On January 5 and 10, 2006, the Plaintiff was seen by Dr. Fedje-Johnston.  [T. 574, 575].  The Plaintiff reported severe neck pain, and was then taking OxyContin and Percocet.  Id.  Dr. Fedje-Johnston referred the Plaintiff for a neurosurgery consultation.  [T. 574].

In a letter to the Plaintiff's counsel dated February 7, 2006, the Plaintiff's psychotherapist provided an evaluation of the Plaintiff's mental health.  [T. 579].  The psychotherapist advised that the Plaintiff had been diagnosed with Depressive Disorder not otherwise specified, which was a more "deep-seated" depression than his original diagnosis of Adjustment Disorder.  Id.  The psychotherapist concluded that the Plaintiff's work injury "precipitated his depression," and that his depression would likely continue because of the Plaintiff's ongoing financial struggles.  [T. 580].

On March 1, 2006, the Plaintiff was seen by Dr. Fedje-Johnston. [T. 582]. The Plaintiff reported that his pain had slowly improved, although it continued. Id. Dr. Fedje-Johnston refilled the Plaintiff's precriptions for OxyContin, Percocet, Naproxen, and Ambien. Id.

        3.    Other Records. Following his work injury, the Plaintiff began working with a Qualified Rehabilitation Consultant ("QRC") in July of 2002, in an effort to find new employment, upon the recommendation of his attorney. [T. 72, 122, 124-49]. In a note dated August 15, 2002, the QRC noted that the Plaintiff had been enrolled in a Certified Nursing Assistant program, in 2001, but the Plaintiff informed the QRC that he was no longer able to handle the physical demands of that work. [T. 119]. The Plaintiff informed the QRC that he had worked as a bartender from 1984 until 1992. Id. He also worked as a dishwasher, as a restaurant manager, and as a carpet-layer. Id. The Plaintiff stated that he worked for the Minnesota Department of Natural Resources for three (3) to four (4) years, as a crew member and firefighter, including two (2) years as a smokechaser. [T. 119-20, 160-67].

The Plaintiff informed the QRC that he began working for Potlatch in May of 1996, typically in twelve (12) hour shifts. [T. 120]. He had most recently worked as a forklift operator. Id. Following his work injury, the Plaintiff was placed on light

duty, and worked eight (8) hours per day.  Id.  In her notes, the QRC observed that, on June 21, 2002, Dr. Fedje-Johnston determined that the Plaintiff suffered from neck strain, and should be restricted to lifting ten (10) pounds, with limited activity.  [T. 122].  On July 15, 2002, Dr. Fedje-Johnston released the Plaintiff for full-time work with no restrictions.  Id.  However, on July 29, 2002, the Plaintiff was restricted to eight (8) hour shifts, and on August 21, 2002, Dr. Fedje-Johnston recommended that the Plaintiff be restricted to light-duty work, for eight (8) hours per day. [T. 120].  The Plaintiff informed the QRC that he suffered from constant headaches.  [T. 121].  The QRC noted that the Plaintiff's work restrictions made it impossible for him to return to his prior work, as a bartender, firefighter, or forklift driver.  Id.  She also noted that he would not be able to return to work at Potlatch unless his grievance was successful. [T. 116, 150-59].

Accordingly, the QRC determined that the Plaintiff was eligible for vocational rehabilitation services.  [T. 117].  With the help of the QRC, the Plaintiff began looking for work.  [T. 114].  The Plaintiff began coursework in a Licensed Practical Nurse ("LPN") program, at Itasca Community College.  Id.  He believed that his physical condition would improve, so as to permit that type of work.  Id.  In a letter to the QRC, Dr. Eckman advised that he expected the Plaintiff to recover, so as to permit

a career as an LPN.  [T. 423].  Dr. Eckman recommended that the Plaintiff "focus on his education preparation and vocational rehabilitation aspects which are more likely to enhance long-term success than [to push] on with a job search with restrictions at this time."  Id.

In November of 2002, the Plaintiff informed the QRC that he had missed some school, due to his back and neck pain.  [T. 110].  The Plaintiff reported that he suffered from a headache after walking one (1) mile, while deer hunting.  Id.  The Plaintiff's absences from school continued through December of 2002.  [T. 108].

In her notes from December 18, 2002, the QRC observed that Dr. Eckman recommended that the Plaintiff be restricted from work.  [T. 107].  Around the same time, the Plaintiff began physical therapy.  [T. 106-07].  In February of 2003, Dr. Eckman again recommended that the Plaintiff remain off work.  [T. 105].  In her notes from August of 2003, the QRC noted that the Plaintiff had been providing part-time child care.  [T. 100].  By early September of 2003, however, the Plaintiff had stopped providing child care.  [T. 99].  He had not re-enrolled in his LPN coursework at that time.  [T. 96, 104].  In November of 2003, Dr. Eckman recommended that the Plaintiff remain off work, but informed the QRC that at best, the Plaintiff would be able to

consider sedentary to light-duty employment, with no heavy equipment, no overhead lifting, and no truck driving.  [T. 95].

While his job search with the QRC was pending, on August 1, 2002, the Plaintiff filed a Claim Petition for workers' compensation benefits.  [T. 72].  Following a Hearing on February 23, 2004, a State Compensation Judge granted the Plaintiff's Petition, and ordered the Plaintiff's former employer to pay temporary total disability benefits.  [T. 65-75].  The employer appealed, [T. 76-77], but on October 12, 2004, the Workers' Compensation Court of Appeals affirmed the decision of the Compensation Judge, concluding that the Plaintiff had not reached maximum medical improvement, with respect to his injury.  [T. 88-93].

4.    Evidence Presented to the Appeals Council.  On August 1, 2005, the Plaintiff underwent an MRI, which revealed mild degenerative disc disease, unchanged since May of 2004.  [T. 591].  The findings of the MRI were also consistent with a Type I or II Arnold-Chiari malformation.  Id.

On November 25, 2005, the Plaintiff was seen by Dr. Eckman for a follow-up visit.  [T. 588].  Dr. Eckman noted that the Plaintiff suffered from severe headaches three (3) to four (4) times per week, lasting from two (2) hours, to all day.  Id.  The Plaintiff also reported near-constant neck pain, and difficulty sleeping.  Id.  The

Plaintiff reported that driving his car bothered him, and that he had not attempted to go deer hunting that fall.  Id.  The Plaintiff was walking for exercise, approximately one (1) mile, twice per week.  [T. 589].  Dr. Eckman noted that the Plaintiff had good range of motion in his shoulders, and a good grip, that he was able to sit through the interview, and that he ambulated well.  Id.  Dr. Eckman concluded that the Plaintiff "would have trouble obtaining gainful employment with his current situation," but he noted that the Plaintiff's condition was "much the same overall[.]"  Id.  Dr. Eckman recommended that the Plaintiff remain off work.  [T. 594].

On March 30, 2006, the Plaintiff was again seen by Dr. Eckman.  [T. 586].  Dr. Eckman noted that the Plaintiff had trouble turning his head to look behind him, especially while driving.  Id.  The Plaintiff reported that he had more pain on the right side of his neck than on the left, and that he suffered from headaches several times per week.  Id.  The Plaintiff also reported that he had trouble with housework, including vacuuming, sweeping, and washing the dishes.  Id.  Dr. Eckman reported that the Plaintiff had good dexterity and function in his hands, and that he was trying to walk, for exercise.  Id.  The Plaintiff also had good range of motion in his upper extremities, although he was moderately tender upon palpation.  [T. 587].  Dr. Eckman reported that he had encouraged the Plaintiff to quit smoking, and to alternate heat and cold for

- 37 -

pain relief.  Id.  Dr. Eckman also suggested the Plaintiff's usual course of treatment, including resting, stretching, and walking, and a continuation of his OxyContin, Percocet, Naproxen, Effexor, and Prevacid.  Id.  Dr. Eckman recommended that the Plaintiff remain off work.  [T. 593].

On August 3, 2006, the Plaintiff returned to Dr. Eckman.   [T. 602].  At that time, the Plaintiff was still suffering from headaches between three (3) and four (4) times per week, which resulted in a trip to the emergency room approximately once a month.  Id.  Dr. Eckman noted that the Plaintiff had discontinued Effexor and Ambien, and started taking Wellbutrin[28] and Klonopin.[29]  [T. 603].  The Plaintiff had good hand function, good range of motion in his upper extremities, and moderate sensitivity upon palpation.  [T. 602-03].  Dr. Eckman recommended continuing his course of treatment. [T. 603].

On September 16, 2006, Dr. Eckman sent a letter to the Plaintiff's attorney, and informed him that there had been "no striking new development or major change" in the Plaintiff's condition.  [T. 599].  Dr. Eckman stated that the Plaintiff's work injury

---

[28]Wellbutrin is "indicated for the treatment of depression."   Physician's Desk Reference, pp. 1579 (60th ed. 2006).

[29]Klonopin is "indicated for the treatment of panic disorder[.]"   Physician's Desk Reference, pp. 2782 (60th ed. 2006).

was the substantial cause of his disability, and that the Plaintiff's disc degeneration resulted in a ten (10) percent permanent partial disability.  <u>Id.</u>  Dr. Eckman further stated that the Plaintiff's condition rendered him permanently unable to return to gainful employment.  <u>Id.</u>  Dr. Eckman observed that the Plaintiff was a "work-oriented fellow," who would be "delighted to be able to return to gainful employment[.]"  <u>Id.</u> Dr. Eckman stated that the Plaintiff's emotional struggle with his condition, his lack of employment, and his resultant financial difficulties, had contributed to his permanent partial disability.  [T. 600].  Dr. Eckman felt that the Plaintiff's financial struggles provided him with an economic motivation to return to work.  <u>Id.</u>

      B.   <u>Hearing Testimony</u>.  The Hearing on February 13, 2006, commenced with some opening remarks by the ALJ, in which she noted the appearance of the parties for the Record.  [T. 606].  The ALJ asked the Plaintiff's attorney if he had any objections to the evidence being introduced into the Record, and the Plaintiff's attorney stated that he did not.  [T. 607].

      The ALJ then swore the Plaintiff to testify, and began her questioning by asking the Plaintiff about his education.  [T. 608].  The Plaintiff testified that he had completed high school, and taken some general college coursework.  [T. 608-610]. The Plaintiff stated that he had worked as a certified nursing assistant, and that he had

worked as a laborer and firefighter for the Minnesota Department of Natural Resources, and for the United States Forest Service.  [T. 611].

In response to the ALJ's inquiry, the Plaintiff testified that he was currently unable to work due to the pain in his neck and upper back, and because he had lost the strength in his arms.  Id.  The Plaintiff testified that, prior to his injury, he was able to carry a fifty (50) pound bag of dog food, or cut a fireline for miles, without difficulty.  [T. 616].  The Plaintiff testified that his pain was constant, but that it varied in intensity, depending on his activities.  [T. 612].  The Plaintiff stated that his pain worsened with any physical movement.  Id.  He testified, however, that he was able to walk up to one-quarter of a mile, and to stand for thirty (30) to forty-five (45) minutes, without discomfort.  [T. 613].  He further testified that, when sitting, he had to change positions every five (5) minutes or so.  [T. 614].

The ALJ asked how much weight the Plaintiff could lift, and the Plaintiff replied that he was able to lift eight (8) to ten (10) pounds.  [T. 615].  The Plaintiff testified that, for exercise, he walked two (2) blocks to the grocery store, and carried milk home, but that the exercise inflamed his neck.  Id.  He also testified that he had recently repaired a ceiling light fixture, at the home of some elderly acquaintances.  The Plaintiff stated that in order to remove and later replace the ceiling light, which weighed

- 40 -

approximately four (4) pounds, he had lifted his arms over his head.  The Plaintiff stated that he experienced pain, due to that activity, for two (2) days, despite taking his normal pain medications.  [T. 615-16].  The Plaintiff testified that he suffered severe headaches, up to four (4) times per week, which left him unable to leave his bed.  [T. 617].  He also testified that he alternated ice packs and hot packs, as well as up to four (4) hot baths per day, to relieve the tension in his neck.  [T. 618-20].  The Plaintiff testified that he had recently suffered from a severe headache, which had lasted five (5) days.  [T. 620].  The Plaintiff stated that his doctor asked him if he wished to try physical therapy, in order to relieve his headache symptoms, but the Plaintiff had declined.  Id.  Instead, the Plaintiff rested in bed for the duration of the headache.  Id.

The ALJ noted that the Plaintiff had been treated for depression, and the Plaintiff testified that his depression did not keep him from working.  Rather, the Plaintiff testified that his inability to work had caused his depression.  [T. 618].  The Plaintiff further stated that his doctor had tried numerous medications to relieve his depression.  [T. 630].  In response to the ALJ's inquiry, the Plaintiff testified that he suffered from short-term memory loss, and grogginess, as a result of his medications.  [T. 628-30].

The ALJ then asked the Plaintiff about his activities of daily living, and he testified that he had custody of his children -- an eight-year-old boy and a sixteen-year-old girl -- every other weekend.  [T. 622].  The Plaintiff testified that he was able to prepare meals, but that he found washing dishes to be difficult, due to his back pain.  [T. 623-25].  The Plaintiff testified that his children often did his dishes, and that his girlfriend prepared his meals, up to three (3) times per week.  Id.  The Plaintiff stated that he vacuumed his house once a week, but that vacuuming exacerbated his back condition.  [T. 625].

The Plaintiff testified that, during the summer of 2004, he was able to attend nearly all of his son's T-ball games.  [T. 627].  He also testified that approximately two (2) weeks prior to the Hearing, he took his son to the skating rink.  The Plaintiff stated that he did not skate, but that he walked his son across the ice.  Id.  He also testified that he had performed child-care for his ex-wife's infant son, for several hours per week, though he could not recall how much he had been paid.  [T. 630-31].

The ALJ asked the Plaintiff if he was able to drive, and the Plaintiff testified that he drove to Duluth, usually three (3) times each month, for his doctor's appointments.  [T. 621].  He stated, however, that he had not been driving recently, due to his

financial situation.  Id.  He further testified that driving in the winter exacerbated his symptoms, because the rough road conditions jarred his neck and back.  [T. 621-22].

In response to the ALJ's inquiry, the Plaintiff testified that he sometimes visited his girlfriend's hobby farm, but that he had not spent the night there in approximately eighteen (18) months.  [T. 624].  He stated that he was unable to help with the chores at the hobby farm, but that he had mowed her lawn twice, with a riding lawnmower. [T. 625].  The Plaintiff stated that the exertion of this activity had required him to rest in bed for several days.  Id.  He further stated that his children usually mowed his lawn at his home, but that he had occasionally mowed his lawn in 2004.  [T. 625-26].  The ALJ asked the Plaintiff if he had been able to hunt in 2004 and 2005, and the Plaintiff testified that he had not hunted in two (2) years.  [T. 626].  He admitted that he had gone hunting in 2002, following his work injury, but he stated that he had trouble walking in the woods.  Id.

The Plaintiff's attorney then asked the Plaintiff about the work-related recommendations that Dr. Eckman had made to him.  [T. 632].  The Plaintiff explained that he had never been approved to return to full-time work, but that Dr. Eckman had released him to work up to four (4) hours per day, for a period of six (6) months.  Id. The Plaintiff testified that this work release occurred around the time he performed

- 43 -

child-care services for his ex-wife.  Id.  He stated that he was unable to find other part-time employment, because he was unable to work as a laborer, and because he did not have the education required for non-labor positions.  Id.

Next, the Plaintiff's attorney asked the Plaintiff about his medications.  The Plaintiff testified that he was taking OxyContin, Percocet, Naproxen, Effexor, Ambien, and Prevacid, as well as aspirin.  [T. 632-33].  The Plaintiff's attorney asked how well he was sleeping, and the Plaintiff testified that he often did not go to bed until 2:00 to 4:00 o'clock a.m., and that his pain kept him awake throughout the night.  [T. 634].  The Plaintiff testified that upon awaking, at 8:00 or 9:00 o'clock a.m., he would take his medications, and lie down again until the medications began working.  Id.  The Plaintiff stated that he typically spent four (4) to six (6) hours per day, lying in his bed or in a reclining chair.  [T. 635].

The Plaintiff's attorney next asked the Plaintiff about his work history.  The Plaintiff testified that he had previously worked as a bartender, and often lifted cases of liquor and beer, and full sixteen (16) gallon kegs, carrying them for up to forty (40) feet, or up stairs.  [T. 635-36].  The Plaintiff testified that he now had difficulty carrying a gallon of milk for two (2) blocks.  [T. 637].

The ALJ then swore the Medical Expert ("ME") to testify, and asked him if he had any questions for the Plaintiff. [T. 639-40]. The ME replied that he did not have any questions. [T. 640]. The ALJ then asked the ME to set forth the Plaintiff's impairments as he noted them from the Record. Id. The ME noted that the Plaintiff had been treated for neck pain, with upper extremity radiation, and some headaches. Id. The ME reported that the Plaintiff had been injured in May of 2002, and treated for neck pain, headaches, and neck strain. Id. The ME also reported findings of degenerative disc disease at several levels. [T. 640-41]. The ME stated that the Plaintiff had received non-surgical treatment, including Botox injections, facet rhizotomies, facet injections, and medication. [T. 641].

The ME noted that the Plaintiff had not lost any neurological function, in his upper extremities, nor suffered atrophy. Id. The ME further noted that the Plaintiff had good hand function. Id. The ME stated that some of the examining physicians had concluded that the Plaintiff had a normal range of motion, but others had found a decreased range of motion. Id. The ME stated that the Plaintiff had received psychiatric diagnoses of adjustment disorder with depressed mood, personality disorder, depression, anxiety, tobaccoism, and hypochondriacal tendencies. Id. In

response to the ALJ's inquiry, the ME stated that he had not seen a diagnosis of chronic pain syndrome, nor of sleep apnea, in the Record.  Id.

The ALJ asked the ME if he felt that any of those conditions were limiting, and the ME testified that he would preclude the Plaintiff from performing overhead work, and from more than occasional pushing or pulling.  [T. 642].  The ME also stated that the Plaintiff would not be able to work with vibrating machinery, or maintain a fixed head position, nor would he be able to perform any continuous neck movement.  Id. The ME added that the Record did not support a limit on the amount of time the Plaintiff could stand, but that he would be unable to work with hazardous machinery, or unprotected heights, due to his medication use.  Id.  The ME added that he believed the Plaintiff was capable of full-time work, in contrast to Dr. Eckman's recommendation for part-time work.  [T. 642-43].  The ME testified that the Record lacked documentation to support Dr. Eckman's conclusion that the Plaintiff suffered from an impaired cervical range of motion, or muscle spasms.  [T. 643].

The ALJ then invited the Plaintiff's attorney to ask the ME questions, and he began by asking the ME about Dr. Eckman's recommended work restrictions.  Id. The ME testified that Dr. Eckman's opinion was likely based on the severity of the Plaintiff's pain.  [T. 644].  The Plaintiff's attorney then asked if the ME had declined

- 46 -

to consider the severity of the Plaintiff's pain, because those complaints were subjective.  Id.  The ME replied that he considered the severity of pain that would be typical of a person with multi-level degenerative disc disease, rather than the Plaintiff's subjective complaints.  Id.  The Plaintiff's attorney then asked the ME if he had considered the Plaintiff's psychiatric impairments, and he replied that he had not.  Id.  The Plaintiff's attorney asked no further questions.  Id.

Next, the ALJ swore the vocational expert ("VE") to testify.  Id.  The ALJ asked the VE if he had any questions for the Plaintiff, and the VE replied that he did not.  [T. 645].  The VE stated that he wished to amend his earlier report, based on the Plaintiff's testimony, because he concluded that the Plaintiff's bartender work had exceeded the light-duty level of employment, and would more accurately fit the medium- to heavy-duty range of work.  [T. 644-45].

Next, the ALJ posed a hypothetical to the VE, in which he asked the VE to assume an individual with a high school education, who was forty-one (41) years old, with past work experience as set out in the VE's amended report, and with the impairments noted in the Record, including degenerative disc disease, cervical strain, and mental impairments, including adjustment disorder, anxiety, and depression.  [T. 646].  The individual was taking medication, which resulted in grogginess or lack of

mental clarity, and was subject to pain.  Id.  The individual was limited to lifting no

more than ten (10) pounds occasionally, but would be capable of walking, standing,

or sitting for six (6) hours out of an eight (8) hour workday.  [T. 646-47].  The

individual was unable to perform any overhead work, and could not sustain any static

positioning of the neck, nor any continuous neck motion.  [T. 647].  In addition, the

individual could only occasional push and pull, could not work with vibrating

machinery, and could not work near hazards or at unprotected heights.  Id.  Finally,

based on the individual's medications, he was limited to routine, repetitive, unskilled

work, which required only brief and superficial contact with others.  Id.  The ALJ

asked the VE if such an individual could perform the Plaintiff's past relevant work.

Id.  The VE replied that he could not.  Id.

The ALJ then asked the VE if there were other jobs in the national economy,

which could be performed by an individual with those limitations.  Id.  The VE

explained that the individual could work as a surveillance system monitor, and that

2,400 such positions existed in the State of Minnesota; that the individual could work

as an order clerk, and that 6,500 such positions existed in the State of Minnesota; and

that the individual could work as a final assembler, and that 4,600 such positions

existed in the State of Minnesota.  [T. 647-48].  The ALJ then amended the

hypothetical, in order to ask the VE if the individual could be excused from work up to three (3) days per week, due to severe headaches.  [T. 648].  The VE replied that such absences would not be consistent with competitive employment.  Id.  The ALJ then asked the VE if the individual could be excused from work for up to three (3) hours per day, to relieve his severe neck pain with heat or ice.  [T. 648].  The VE again replied that such absences would not be consistent with competitive employment.  Id.

Next, the Plaintiff's attorney asked the VE how his testimony regarding the first hypothetical would change if the individual missed only one (1) day of work per week, due to severe headaches.  Id.  The VE testified that missing anything more than two (2) days per month would be inconsistent with competitive employment.  [T. 649].

C.     The ALJ's Decision.  The ALJ issued her decision on July 24, 2006.  [T. 16-26].  As she was required to do, the ALJ applied the sequential, five-step  analytical process, that is prescribed by 20 C.F.R. §§404.1520 and 416.920.[30]  As a threshold

---

[30]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

(1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or

matter, the ALJ noted that, on March 18, 2004, the Plaintiff had filed a protective

application for DIB.  [T. 16].  The ALJ observed that the Plaintiff had provided up to

thirty-two (32) hours of child-care, per week, to his ex-wife's infant in 2003.  [T. 18].

However, the ALJ stated that further development of the Plaintiff's work history would

unnecessarily delay her decision.  Id.  Accordingly, she concluded that the Plaintiff

had not engaged in substantial gainful activity since his alleged onset date of June 20,

2002, notwithstanding his child-care services.  Id.

Next, the ALJ examined whether the Plaintiff was subject to any severe physical

impairments, which would substantially compromise his ability to engage in gainful

work activity.  Id.  After considering the Plaintiff's medical history, which included the

---

equals a presumptively disabling impairment listed in the
regulations; (4) whether the claimant has the residual
functional capacity to perform his or her past relevant work;
and (5) if the claimant cannot perform the past work, the
burden then shifts to the Commissioner to prove that there
are other jobs in the national economy that the claimant can
perform.
Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has
an impairment that limits his ability to perform basic work activities; and his impairment
is either presumptively disabling, or he does not have the residual functional capacity
to perform his previous work, and he cannot perform other work existing in the
national economy.  Id. at 754.

CASE 0:07-cv-00152-ADM-RLE   Document 11   Filed 01/14/08   Page 51 of 83

reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by cervical strain, degenerative disc disease of the cervical spine, a chronic pain syndrome,[31] and an adjustment disorder with depressed mood and anxiety.   Id.   The ALJ stated that those impairments stemmed from the Plaintiff's work injury in May of 2002.  Id.  Notably, the ALJ acknowledged the Plaintiff's diagnosis of chronic pain syndrome, notwithstanding the testimony of the ME at the Hearing.  Id.  She further concluded that the Plaintiff's cervical sprain, degenerative disc disease, chronic pain syndrome, and adjustment disorder, all constituted severe impairments.  [T. 19].

_____

[31]Chronic pain syndrome may be classified as a Somatoform Disorder under Section 12.07 of the Listings.  Its essential feature is described as follows:

> [A] preoccupation with pain in the absence of adequate physical findings to account for the pain or its intensity. The pain symptom either is inconsistent with the anatomical distribution of the nervous system or, if it mimics a known disease entity (as in angina or sciatica), cannot, after extensive diagnostic evaluation, be adequately accounted for by organic pathology.   Similarly, no pathophysiologic mechanism accounts for the pain, as in tension headaches caused by muscle spasm.

Diagnostic and Statistical Manual of Mental Disorders, p. 264 (3rd Ed. Revised 1987); see also, Weikert v. Sullivan, 977 F.2d 1249, 1251 (8th Cir. 1992); Burns v. Sullivan, 888 F.2d 1218, 1219 (8th Cir. 1989); Parsons v. Heckler, 739 F.2d 1334, 1337 (8th Cir. 1984); The Merck Manual, pp. 1340, 1511 (15th Ed. 1987).

- 51 -

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations. See, 20 C.F.R. §§404.1520(d), and 416.920(d). The ALJ determined that the Plaintiff's physical and mental impairments did not meet, or equal, the criteria of any Listed Impairment, based upon the testimony of the ME, and the Record as a whole. [T. 19].

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy. Id. RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks. See, Title 20 C.F.R. §§404.1545, and 416.945, and Social Security Ruling 96-8p. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, she was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard enunciated in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §§404.1529 and 416.920(a).

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the opinions of the impartial

ME; the objective medical evidence; and the Plaintiff's subjective complaints of pain;

the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity to lift up to ten pounds and is able to stand and/or walk for six hours and sit for six hours in an eight hour workday with no overhead work and no more than occasional push/pull activities with the upper extremities. [The Plaintiff] is precluded from static activities with the neck, such as microscope work, vibrating machines, continuous neck motions and work near hazards and heights.  In addition, [the Plaintiff] is limited to routine, repetitive, unskilled work not involving more than brief and superficial contact with others.

[T.19].

In determining the Plaintiff's RFC, the ALJ evaluated his physical and mental impairments employing the procedures set out in 20 C.F.R. §§404.1520a, and 416.920(a).  Id.  The ALJ noted that she had carefully considered the entire Record, including the testimony of the Plaintiff, and found that the Plaintiff's impairments could reasonably be expected to produce his alleged symptoms.  [T. 20].  She concluded, however, that the Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible."  Id.

The ALJ concluded that the objective medical evidence was inconsistent with the Plaintiff's claimed symptoms.  [T. 21].  She noted that the Plaintiff underwent

physical therapy, following his work injury, and made good progress with increasing his range of motion, and with decreasing his tenderness and pain. [T. 20]. She also noted that Dr. Fedje-Johnston, the Plaintiff's treating physician, concluded that the Plaintiff could return to work on July 15, 2002. Id. When the Plaintiff continued to complain of severe neck and shoulder pain, and headaches, he underwent further treatment, including nerve block injections, Botox injections, cervical injections, and radio frequency neurotomies. Id. The ALJ observed, however, that the Plaintiff consistently demonstrated normal strength, sensation, and reflexes in his upper extremities, as well as good hand function, and that he had occasionally demonstrated a normal range of motion. [T. 21].

The ALJ further observed that MRI scans revealed only mild degenerative disc disease, and that his physicians had not recommended surgical intervention. Id. Instead, the ALJ stated that the Plaintiff followed a conservative course of treatment, including hot baths, cold packs, and rest. Id. She noted that he had not reported to any of his physicians that his headaches sometimes lasted for days. Id.

The ALJ concluded that the Plaintiff's activities of daily living were inconsistent with his claimed disability. [T. 22]. As noted by the ALJ, the Plaintiff reported that he lived alone, groomed himself, cooked, drove to doctor's appointments, attended

his son's sporting events, gardened, spent time at his girlfriend's hobby farm, went hunting, and regularly cared for his ex-wife's infant son, up to thirty-two (32) hours per week in 2003.  [T. 21].  However, the ALJ acknowledged the Plaintiff's assertion, that he required frequent breaks when engaging in any activity.  Id.

The ALJ arrived at the Plaintiff's RFC after considering the opinions of the ME. [T. 22].  The ALJ noted that the ME had reviewed the Plaintiff's entire medical file, and was familiar with the disability review process.  [T. 22]. The ALJ also considered the opinions of the IME, and of Dr. Fedje-Johnston.  Id.  The ALJ gave those opinions significant weight, as they were consistent with their examinations of the Plaintiff, and with the ME's opinion.  Id.

In addition, the ALJ gave some weight to the opinion of Dr. Chisholm, who concluded that the Plaintiff was able to lift twenty (20) pounds occasionally, and ten (10) pounds frequently, and was able to stand, sit, or walk for six (6) hours per workday.  Id.  The ALJ did not adopt Dr. Chisholm's opinion in its entirety, because she noted that Dr. Chisholm did not have the opportunity to review the Plaintiff's entire medical file, and that the Records received at the Hearing supported greater work restrictions than those recommended by Dr. Chisholm.  Id.

- 55 -

With respect to Dr. Eckman, the ALJ declined to place significant weight on his opinion. <u>Id.</u> The ALJ observed that Dr. Eckman initially concluded that the Plaintiff was able to work, at least part-time, but that later, Dr. Eckman determined that the Plaintiff was totally disabled from work activity. <u>Id.</u> The ALJ noted that Dr. Eckman had not changed his opinion, based on any identifiable change in the Plaintiff's condition. <u>Id.</u> The ALJ further observed that, following his examinations of the Plaintiff, Dr. Eckman had concluded the Plaintiff suffered from a reduced range of motion and tenderness, even as he noted that the Plaintiff had been riding a four-wheeler, performing child care, and cooking. <u>Id.</u> The ALJ concluded that Dr. Eckman's opinions were inconsistent, and were not supported by objective medical evidence. <u>Id.</u>

The ALJ also considered the mental impairments identified in the Plaintiff's medical record. <u>Id.</u> The ALJ observed that the Plaintiff complained of poor concentration, difficulty sleeping, loss of energy, and feelings of hopelessness. [T. 22-23]. The ALJ stated that the Plaintiff's therapists believed his adjustment disorder and depression were caused by situational distress, primarily his displacement from work. <u>Id.</u> In addition, the ALJ placed significant weight on the opinion of the State Agency psychiatrist, who reviewed the Plaintiff's medical records. [T. 23]. The State Agency

psychiatrist concluded that the Plaintiff had mild restrictions in his activities of daily living; mild to no difficulties with social functioning; but moderate difficulties with concentration, persistence, and pace. Id. As a consequence, the State Agency psychiatrist concluded that the Plaintiff could understand and remember routine, repetitive instructions, and carry out routine, repetitive tasks. Id.

Based on the Plaintiff's reported activities, the ALJ concluded that the Plaintiff experienced only mild restrictions in his activities of daily living. [T. 23]. She observed that the Plaintiff related well to his mother, his children, and his girlfriend, and had no difficulty going out in public. Id. The ALJ concluded that the Plaintiff experienced mild to no difficulties maintaining his social functioning. Id. She further concluded that the Plaintiff experienced moderate difficulties maintaining his concentration and pace, but that he would be able to understand and perform routine, repetitive tasks. Id.

Based upon her findings, the ALJ found that the extent of the Plaintiff's subjective complaints, and his alleged limitations, were not entirely credible. [T. 24]. She noted that the Plaintiff had not reported all of his alleged limitations to his treating physicians. Id. She also observed that, although the Plaintiff had worked steadily until his injury in 2002, the Record failed to reveal any evidence that the Plaintiff had

attempted to find work since then.  Id.  The ALJ recognized that the Plaintiff had been

terminated from his last position at Potlatch, and that he had asserted a workers'

compensation claim, with respect to his work injury, which could serve as a

disincentive against the Plaintiff's return to work.  Id.  The ALJ concluded that the

Plaintiff was capable of performing light, unskilled work, notwithstanding his

subjective complaints.  Id.

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff was not

capable of performing his past relevant work as a forklift operator, which required

medium exertion; or as a smoke chaser or a brush cutter, which require heavy exertion;

or as a bartender, which required light exertion.[32]  Id.

Proceeding to the Fifth Step, the ALJ then concluded that a significant number

of jobs existed, in the national economy, which the Plaintiff could perform.  [T. 25].

The ALJ recounted the VE's testimony, that persons, who had functional limitations

like the Plaintiff, could work as a surveillance system monitor, an order clerk, or a final

assembler.  Id.  The ALJ also noted that the VE testified that there existed

---

[32]Although the ALJ's decision refers to bartending work as light exertion, we
note that, at the Hearing, the VE stated that the Plaintiff's bartending work, as
described in the Plaintiff's testimony, was better classified as medium-duty work.  [T.
645-46].

- 58 -

approximately 2,400 surveillance system monitor jobs, 6,500 order clerk jobs, and 4,600 final assembler jobs, in the economy of the State of Minnesota. Id. Finding the VE's testimony to be credible, and persuasive, the ALJ found that there existed a significant number of jobs that the Plaintiff could perform. Id. As a result, the ALJ concluded that the Plaintiff was not disabled. Id.

## IV.  Discussion

A.    Standard of Review.    The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole. See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, Wilcutts v. Apfel, 143

F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82

F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v.

<u>Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

Lastly, where, as here, the Plaintiff submits additional evidence to the Appeals Council for review, which was not considered by the ALJ, our task on review is not completed until we "determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1068 (8th Cir. 2000), quoting <u>Riley v. Shalala</u>, 18 F.3d 619, 622 (8th Cir. 1999); see also, <u>Flynn v. Chater</u>, supra at 621. "Evaluating such evidence requires us to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing." <u>Jenkins v. Apfel</u>, 196 F.3d 922, 924 (8th Cir. 1999), citing <u>Riley v. Shalala</u>, supra at 622.

B.    <u>Legal Analysis</u>.   In support of his Motion for Summary Judgment, the Plaintiff asserts that the ALJ failed to give the proper weight to the opinion of his treating physician, and likewise, failed to afford the appropriate weight to the Plaintiff's subjective complaints.  See, <u>Plaintiff's Memorandum</u>, <u>Docket No. 7</u>, at 8-10, 13. Since the ALJ's evaluation of the Plaintiff's credibility impacts upon the weight he accorded to the treating physician's opinion, we address the credibility issue first.

1.    Whether the ALJ Failed to Consider the Plaintiff's Subjective
      Complaints.

          a.    Standard of Review.   The governing law makes clear

that credibility determinations are initially within the province of the ALJ.  See, Dukes

v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006)("Where adequately explained and

supported, credibility findings are for the ALJ to make."), quoting Lowe v. Apfel, 226

F.3d 969, 972 (8th Cir. 2000), citing Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir.

2000); see also, Driggins v. Bowen, 791 F.2d 121, 125 n.2 (8th Cir. 1986); Underwood

v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination

must be supported by substantial evidence on the Record as a whole.  See, Leckenby

v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007)("We do not reweigh the evidence

presented to the ALJ, and we defer to the ALJ's determinations regarding the

credibility of testimony, as long as these determinations are supported by good

reasons and substantial evidence."), citing Gonzales v. Barnhart, 465 F.3d 890, 894

(8th Cir. 2006); see also, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

      To be legally sufficient, the ALJ must make an express credibility determination,

must set forth the inconsistencies in the Record which led to the rejection of the

specific testimony, must demonstrate that all relevant evidence was considered and

evaluated, and must detail the reasons for discrediting that testimony.   See,
Eichelberger v. Barnhart, supra at 590 ("The ALJ must make express credibility
determinations and set forth the inconsistencies in the record which cause him to reject
the plaintiff's complaints."); Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004);
Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223
(8th Cir. 1995); Ricketts v. Secretary of Health and Human Services, 902 F.2d 661,
664 (8th Cir. 1990).   These requirements are not mere suggestions, but are mandates
that impose affirmative duties upon the ALJ.   See, Johnson v. Secretary of Health and
Human Services, 872 F.2d 810, 814 n.3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility
finding, on the basis of subjective symptoms, has been firmly established in the Eighth
Circuit by Polaski v. Heckler, supra, and its progeny.  See, e.g., Flaherty v. Halter, 182
F. Supp. 2d 824, 829 (D. Minn. 2001);  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir.
1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996).
Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective
symptoms, include the Plaintiff's prior work record and the observations of third
parties, and of physicians, concerning:

1.    the claimant's daily activities;

- 64 -

2.      the duration, frequency, and intensity of the pain;

3.      precipitating and aggravating factors;

4.      dosage, effectiveness and side effects of medication;

and

5.      functional restrictions.

Polaski v. Heckler, supra at 1321-22; see also, Gonzales v. Barnhart, supra at 895 (listing factors for credibility analysis); Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006)(same).  The ALJ must not only consider those factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole.  Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).  "However, the ALJ need not explicitly discuss each Polaski factor."  Eichelberger v. Barnhart, supra at 590, citing Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  "The ALJ only need acknowledge and consider these factors before discounting a claimant's subjective complaints."  Id.

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them.  See, Ostronski v. Chater, supra at 418; Jones v.

Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain).  "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [claimant's] subjective pain complaints are not credible in light of objective medical evidence to the contrary.'"  Gonzales v. Barnhart, supra at 895, quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)[internal citation omitted].

It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual.  See, Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983).  For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated."  O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974).  Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a

whole.  See, Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater,

supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the

Polaski factors in any given Record, which could justify an ALJ's credibility

determination with respect to a Plaintiff's subjective allegations of debilitating

symptoms, is multi-varied.  For example, an individual's failure to seek aggressive

medical care militates against a finding that his symptoms are disabling.   See,

Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d

1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).  By

the same token, "[i]nconsistencies between subjective complaints of pain and daily

living patterns may also diminish credibility."  Pena v. Chater, 76 F.3d 906, 908 (8th

Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997) (ALJ

may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75

F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487.

Among the daily activities, which counterindicate disabling pain, are:  a practice

of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir.

1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; doing yard work, Swope

v. Barnhart, 436 F. 3d 1023, 1024 (8th Cir. 2006); and grocery shopping, Johnson v.

Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).  Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain.  See, Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

        b.     Legal Analysis.  In arriving at the Plaintiff's RFC, the ALJ found significant inconsistencies between his subjective complaints, and the Record as a whole.  Guided by Polaski and its progeny, the ALJ found the credibility of the Plaintiff, as to the severity of his impairments, to be undermined by his medical records, and by his course of treatment.

In discounting the Plaintiff's testimony, the ALJ referenced medical evidence of Record that related to the Plaintiff's complaints.  Specifically, the ALJ cited to medical reports, which revealed that the Plaintiff had consistently complained of severe pain in his neck and shoulders, resulting in headaches.  [T. 20].  However, the ALJ observed that the Plaintiff consistently demonstrated a good range of motion and hand function, with normal strength, sensation and reflexes.  [T. 20-21].  In addition, diagnostic testing revealed only mild degenerative disc disease, and the ALJ relied on the opinion of the ME, who concluded that the Plaintiff's subjective complaints were "out of proportion to any objective abnormalities."  [T. 21].

The ALJ also considered the Plaintiff's course of treatment, in determining that the Plaintiff's testimony was not credible. The ALJ observed that the Plaintiff used hot baths, cold packs, and rest, to relieve his pain, and the ALJ concluded that such a conservative course of treatment was inconsistent with his claimed subjective complaints. Id. The ALJ noted that the Plaintiff was not considered a surgical candidate, and also noted that the Plaintiff had reported good results from his medications, including Oxycontin and Percocet. Id.

As to the Plaintiff's activities of daily living, the ALJ observed that the Plaintiff lived alone, maintained his personal hygiene, attended his son's sporting events, provided transportation for his son, and provided child-care services for his ex-wife, for thirty-two (32) hours per week in 2003. Id. The Plaintiff also reported gardening, with frequent breaks, and hunting, and he had taken community college classes. The ALJ concluded that the Plaintiff "is able to lead a relatively active lifestyle and engage in activities for extended period [sic] of time[.]" Id. In particular, the ALJ concluded that the Plaintiff's ability to provide regular child care suggested that "his impairments are not as limiting as he asserts." [T. 22]. Based on the sum of this evidence, the ALJ found that the Plaintiff experiences mild restrictions in activities of daily living. [T. 23]. However, given the evidence of the Plaintiff's relationships with his mother, his

children, and his girlfriend, the ALJ concluded that the Plaintiff experiences mild to no difficulties with social functioning.  Id.

The ALJ acknowledged, however, that the Plaintiff had been diagnosed with an adjustment disorder, due to his displacement from work and related stressors.  [T. 22]. As a result, the Plaintiff reported depression, a loss of energy, and mild difficulty with concentration.  Id.  Accordingly, relying on the opinion of the State Agency psychiatrist, the ALJ found that the Plaintiff experienced moderate difficulties with concentration, persistence, and pace, [T. 23], and she incorporated that finding into the RFC.  [T. 19].

Last, the ALJ observed that the Plaintiff had worked steadily until 2002, when he suffered a work injury, but she found no evidence that he had attempted to find work since that time.  [T. 24].  The ALJ concluded that the Plaintiff's worker's compensation lawsuit served as a disincentive against any attempt to find new work. Id.

As a consequence, we are not confronted, as the Plaintiff suggests, with a Record which one-sidedly supported the Plaintiff's assessment of his medical condition, but which, nonetheless, was rejected by the ALJ.  To the contrary, the ALJ

adequately fulfilled her obligation to thoroughly parse the Record, and provide a reasoned explanation for her believability findings.

The Plaintiff argues that the ALJ failed to consider his need for breaks during activities, and the dosage and side-effects of his medication.   However, as previously noted, "the ALJ need not explicitly discuss each Polaski factor."   Eichelberger v. Barnhart, supra at 590, citing Strongson v. Barnhart, supra at 1072.   Here, the ALJ's decision demonstrates that she considered the entirety of the Record, including the objective clinical findings, and the opinions of the physicians, as well as the Plaintiff's course of treatment, activities of daily living, and work history, in discounting the Plaintiff's testimony.   We do not suggest that the Record was devoid of evidence which supported some of the Plaintiff's subjective complaints, but "[w]e will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain," or incapacitation, simply because, in the first instance, we might have reached a different assessment.   Gonzales v. Barnhart, supra at 895, quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005), quoting, in turn, Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).   Accordingly, "[w]e will

- 71 -

defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record."   Ramirez v. Barnhart, supra at 581; see also, Estes v. Barnhart, supra at 724, citing Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).   Since we find no basis to reverse the Plaintiff's credibility rulings, we reject that challenge to the ALJ's determination.

> 2.   Whether the ALJ Improperly Disregarded the Opinion of the Treating Physician.

> a.   Standard of Review.   When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight.   20 C.F.R. §§404.1527 and 416.927; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, supra at 908.   Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.   See, Forehand v. Barnhart, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole.  See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence.  See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.  In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise.  Id.  As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement.  See, Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).  Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion.  Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

- 73 -

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician.  The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole."  See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4).  More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5).  When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments.  See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii).  Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ.  See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1).

        b.     Legal Analysis.  The Plaintiff argues that the ALJ erred in failing to give substantial weight to Dr. Eckman's opinion, since Dr. Eckman was his primary treating physician.  We disagree, for we find that, when the evidence of

Record is viewed in its entirety, those portions of Dr. Eckman's opinion, which were rejected by the ALJ, were not supported by substantial evidence.

As previously noted, the ALJ need not give any weight to a consultative, or a treating physician's conclusory statements regarding total disability. See, 20 C.F.R. §§404.1527(e)(1), and 416.927(e)(1); Rogers v. Chater, supra at 602. If justified by substantial evidence in the Record as a whole, the ALJ can discount the examining, or treating physician's opinion. See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846. Here, the ALJ found that Dr. Eckman's conclusion, that the Plaintiff was unable to be productively employed due to his chronic pain, was inconsistent with his own earlier conclusions, and was unsupported by his own examinations of the Plaintiff. [T. 22]. Specifically, the ALJ noted that Dr. Eckman changed his opinion about the Plaintiff's ability to work, without any corresponding change in the results in his examinations of the Plaintiff. Id. She also observed that Dr. Eckman's examinations revealed tenderness to palpation, with a reduced range of motion, even as the Plaintiff reported riding a four-wheeler, cooking, and providing child-care

services.[33]   Id.   Although the ALJ considered Dr. Eckman's evaluations of the

Plaintiff, she declined to give them significant weight, given these inconsistencies.

In declining to give substantial weight to Dr. Eckman's opinion, the ALJ instead

relied upon the opinion of the ME, who had reviewed the Record.  Id.  The ME found

that the Plaintiff was physically capable of light exertional work, but noted that his

physical impairments would limit him to lifting and carrying ten (10) pounds

occasionally.  Id.  The ME concluded, however, that the Plaintiff had no limits on

sitting, standing, or walking, although he limited him from overhead work, static neck

activities, or continuous neck activities, and recommended only occasional pushing

and pulling, with no work near hazards, heights, or vibrating machines.  Id.  The ALJ

relied on the ME's opinion, based on his specialization, his familiarity with the

disability evaluation process, the fact that his opinion was consistent with the Record

as a whole, and with his own examination of the Plaintiff, and because the ME had the

opportunity to review the entire Record.[34]  Id.

_____

[33]Notably, Dr. Eckman also concluded that the Plaintiff would be able to return to work, as an LPN, once he completed his schooling.  [T. 384, 420-21].

[34]The Plaintiff alleges that the ALJ erred when she relied on the ME's opinion, because, the Plaintiff contends, the ME failed to consider the Plaintiff's diagnosis of chronic pain syndrome.  See, Plaintiff's Memorandum in Support, Docket No. 7, at 8.  However, as previously noted, a simple reading of the ALJ's decision plainly

The ALJ also gave significant weight to Dr. Fedje-Johnson, who first treated the Plaintiff after his work injury, and who concluded that he was able to return to work. [T. 20].  The ALJ found that Dr. Fedje-Johnston's opinion was consistent with his examination of the Plaintiff, and was also consistent with the opinion of the ME.  [T. 22].  The ALJ similarly relied on the opinion of the IME, who conducted three (3) examinations of the Plaintiff.[35]  Id.  The ALJ found that the IME's opinion, that the Plaintiff's subjective complaints were out of proportion to any objective abnormalities, [T. 21], was consistent with the clinical findings of his examinations, and with the opinion of the ME.  Id.

In addition, the ALJ placed significant weight on the mental impairments found in the report of the State Agency psychiatrist, who found that the Plaintiff was capable of routine, repetitive tasks, with brief and superficial contact with others.  [T. 23].  She also relied on the reports of the consultative therapist, who concluded that the Plaintiff had some difficulty with concentration, although his memory was not significantly

---

demonstrates  that the ALJ acknowledges the diagnosis, and recognizes the Plaintiff's chronic pain syndrome as a severe impairment.  [T. 18].

[35]Although the Plaintiff contends that the ALJ mistakenly identified Dr. Larry Stern as a treating physician, [T. 21], we conclude that this was a clerical error, given that the ALJ later properly identified Dr. Stern as an IME.  [T. 22].

impaired.  Id.  However, the ALJ gave only some weight to the physical limitations, which were suggested by Dr. Chisholm, the State Agency physician, that the Plaintiff was capable of lifting up to twenty (20) pounds occasionally, and ten (10) pounds frequently, because Dr. Chisholm did not have the opportunity to review the Plaintiff's entire medical record, and because some of the medical records supported greater restrictions.  [T. 22].

Under the circumstances, here, we are aware of no authority that requires the ALJ to abdicate her obligation to independently assess credibility, and to critically weigh conflicting medical opinions, simply because a medical source has expressed, in solely conclusory terms, opinions as to the Plaintiff's inability to work.  See, e.g., Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); Vandenboom v. Barnhart, supra at 750 ("Dr. Hines [i.e., the claimant's treating neurologist] was of the opinion that Vandenboom would not be able to return to work, but a treating physician's opinion that a claimant is not able to return to work 'involves an issue reserved for the Commissioner and therefore is not

the type of "medical opinion" to which the Commissioner gives controlling weight."),
quoting Ellis v. Barnhart, supra at 994.   As a consequence, we find that the ALJ
fulfilled her responsibilities under the Regulations, by explaining, and justifying, the
weight that was given to each of the medical source opinions, and why she found
some opinions more persuasive than others.  See, 20 C.F.R. §404.1527(f)(2)(ii).

We are mindful that the ALJ was confronted by competing and conflicting
medical opinions, as professed by consultative, and treating physicians and, under
those circumstances, the ALJ's obligation is to weigh the competing evidence, and
draw findings based upon the substantial weight of the evidence of Record.
Consistent with her "function to resolve conflicts among the various treating and
examining physicians," Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir. 2006),
quoting Vandenboom v. Barnhart, supra at 749-50, we find that the ALJ thoroughly
reviewed the entirety of the Record, and based her resolution of the medical disputes
on substantial evidence.  We do not suggest that, were we to consider the matter as
one of first impression, we would have reached the same result, for we simply
acknowledge that the resolution that the ALJ reached was well within the
Commissioner's "zone of choice."  See, Vandenboom v. Barnhart, supra at 749,
citing, and quoting, Eichelberger v. Barnhart, supra at 589.

In sum, where, as here, medical evidence conflicts, the obligation of the ALJ is to consider "all of the medical evidence, including [the ME's testimony], weigh[] this evidence in accordance with the applicable standards, and attempt[] to resolve the various conflicts and inconsistencies in the record."   Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003).   After close review, we are satisfied that the ALJ properly weighed the medical opinions in the Record, and afforded those opinions the weight they deserved when considered on the Record as a whole.   See, Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), quoting Cabrnoch v. Bowen, 881 F.2d 561, 564 (8th Cir.1989).

As we previously noted, the Plaintiff submitted additional records from Dr. Eckman to the Appeals Council.   [T. 586-603].   As noted, under 20 C.F.R. §404.970(b), the Appeals Council must consider new and material evidence that relates to the period on or before the date of the ALJ's Hearing decision, and then review the ALJ's decision in light of such evidence.   See, 20 C.F.R. §404.970; Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007).   Here, the Appeals Council considered Dr. Eckman's additional reports, as well as the rest of the evidence of Record, and found no reason to alter the ALJ's decision.   [T. 8-10].

Once it is clear that the Appeals Council considered additional evidence, we must determine if the ALJ's decision is still supported by substantial evidence in light of that new evidence, by determining how the ALJ would have weighed that evidence if it had been presented at the Hearing. See, O'Donnell v. Barnhart, 318 F.3d 811, 815 (8th Cir. 2003)(citing cases); Flynn v. Chater, supra at 622; Mackey v. Shalala, 47 F. 3d 951, 953 (8th Cir. 1995). The additional records covered several follow-up visits with Dr. Eckman, which occurred between November of 2005, and September of 2006. Those records reveal that the Plaintiff's condition was essentially unchanged, and that he continued to be diagnosed with mild degenerative disc disease. [T. 586-94]. The Plaintiff continued to demonstrate good range of motion in his upper extremities, as well as good hand function. [T. 586, 589, 602-03]. Although the Plaintiff reported, in August of 2006, that he suffered from headaches three (3) to four (4) times per week, [T. 602], Dr. Eckman consistently recommended that the Plaintiff continue his conservative course of treatment. [T. 587, 603]. Moreover, in a letter to the Plaintiff's attorney, dated September 16, 2006, Dr. Eckman acknowledged that the Plaintiff's condition had not changed. [T. 599].

We find no new information in Dr. Eckman's later reports, which were provided to the Appeals Council, that would support a reversal of the ALJ's decision. At the

time she rendered her decision, the ALJ was fully aware of Dr. Eckman's opinion, and she had ample evidence of the Plaintiff's degenerative disc disease, and of his conservative course of treatment.   Moreover, an ALJ's decision is not subject to reversal "merely because substantial evidence would have supported an opposite conclusion." Khalil v. Barnhart, 58 Fed.Appx. 238, 240 (8th Cir. 2003), quoting Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984).  Therefore, finding no error in the ALJ's decision, that has either been drawn to our attention, or uncovered by our independent review, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is –

RECOMMENDED:

1.   That the Plaintiff's Motion [Docket No. 6] for Summary Judgment be DENIED.

2.   That the Defendant's Motion [Docket No. 8] for Summary Judgment be GRANTED.

Dated:  January 14, 2008                 s/Raymond L. Erickson

                                                  Raymond L. Erickson
                                                  CHIEF U.S.  MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **February 1, 2008**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **February 1, 2008**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.